The Fourth District Appellate Court of the State of Illinois has reconvened. The Honorable Thomas M. Harris presiding. Good morning, counsel. This is case number 4-24-0634, Steve Maxson v. City of Chenoa and Chris Wilder. First, I should apologize to counsel for getting started a little bit late. The previous case took a little longer than anticipated. Before we proceed with arguments, though, could we have appearances for appellant? Yes. Good morning, Your Honors. Dawn Wall for the appellant, Steve Maxson. Right. And for the appellee? Good morning, Your Honor. Chris Sokin for the appellee, the City of Chenoa. Okay. Thank you. Ms. Wall, you may proceed with your argument. Very good. Thank you. May it please the court, counsel, we are here this morning before Your Honors on appeal of a decision by the Circuit Court here in McLean County granting the motion for summary judgment that was filed by the defendant, City of Chenoa, with respect to the plaintiff's second amended complaint. Essentially, we are here today, Your Honors, with respect to the court's decision granting summary judgment on count one of the second amended complaint and count two of the second amended complaint. Mr. Maxson, in his second amended complaint, asserted that his termination on January 8th of 2018 was in retaliation for his reporting of certain conduct of the mayor and the other commissioners. In count one, we alleged violations of the Illinois Whistleblower Act. We then also alleged count two, alternatively to count one, a common law action for retaliatory discharge. There is no dispute that Mr. Maxson was hired by Chenoa in 2016. His position was as the superintendent of water maintenance and sewerage. He performed that position under the supervision of a city commissioner. His assigned city commissioner was Don Schultice, and Mr. Maxson acknowledged that he was an at-will employee who served at the discretion of Chenoa. However, in cases of retaliatory discharge, the courts have certainly recognized that, and particularly in Kelsey v. Motorola, that simply because an employee is an at-will employee, that does not necessarily end the analysis in retaliatory discharge cases. In the current instance, in order for Mr. Maxson to sustain the allegations of count one of his second amended complaint, he does have to establish that he was discharged, that he was participating in activities that were appropriate, that he did indeed make a disclosure of activities that he had a reasonable basis to believe were illegal or unethical, and that there was a causal relationship between the disclosure that he made and ultimately his discharge. In this instance, there was, in addition to the retaliatory discharge claims, also an initial claim reviewing what the council did on the administrative record that was prepared on January 9th and January 22nd when the commission met in closed session. I would assert to your honors that while that administrative claim the trial court found was not arbitrary and capricious, I would assert that that was based strictly on the evidence in the administrative record and that the trial court did not have the benefit of the deposition testimony, the interrogatories, and the additional information that the plaintiff was able to establish during discovery in this case. With respect to the whistleblower claim, I would assert that the testimony that we garnered during depositions in this case clearly established that Steve Maxson did indeed report conduct to Don Schulteis, his supervisor, that the mayor was participating in illegal activity. Steve Maxson testified that he observed employees of the city of Chenoa performing work at the Chenoa Family Restaurant and that was a private business with a private parking area. Dave Shane, who was an employee of the city of Chenoa, also testified that it was his understanding that Bob Short, one of his co-employees, was asked to perform the cold patch asphalt preparations at the Chenoa Family Restaurant. Don Schulteis, the commissioner, also testified in fact that Steve Maxson and Don Schulteis went out to the Chenoa Family Restaurant and observed that cold patch was being applied on the parking area. Steve Maxson also testified that on an occasion prior to the installation of the cold patch, he did see Dave Shane and Bob Short out doing some preliminary work utilizing city equipment on the Chenoa Family Restaurant parking lot. Now, at the trial court level, when Judge Foley issued her decision granting summary judgment in favor of the defendant, she specifically found that the plaintiff had not presented issues of material fact with respect to the evidence on the cold patch. She found in her decision that was entered in March of 2024 that the cold patch was purchased by Mayor Wilder. I would assert to your honors that that was not a determination that was founded in the evidence. Steve Maxson testified in his deposition that he had observed the level of the cold patch at the city shed and that he testified at page 707 of the record, which was his deposition testimony, that in fact the cold patch had come from the city of Chenoa. Judge Foley outright indicated in her decision that that was not a disputed issue of fact because Chris Wilder testified that he bought it and he had a receipt. The receipt was never presented in evidence. The defendant didn't present it in the record and so I would assert that that is a material issue of fact that is consideration for Steve Maxson's assertions of retaliatory discharge. Counsel, what's the evidence that this is why he was terminated? So, the evidence that we have with respect to that, your honor, really is pretextual and I believe under all of the cases that have recognized retaliatory discharge that the plaintiff does not have to come forward with direct evidence but that we can establish causation by circumstantial evidence. In this instance, Mayor Wilder testified that the instigating reason for Mr. Maxson's termination was this water leak that occurred on December 31st of 2017 and Mr. Maxson was terminated within about eight days of that event and I would assert to your honors that with respect to the city of Chenoa coming forward that that was the proffered reason for Steve Maxson's termination and the fact that the mayor was the instigator of that moving forward before the commission requires an evaluation of the circumstantial evidence. So, in that instance, we then have to look at the testimony of Steve Maxson, Don Schulteis, and even the mayor in fact and Dave Shane. The mayor asserts that Steve Maxson's failure to take care of that leak in July of 2017 was gross negligence but the evidence presented by Steve Maxson, Don Schulteis, in fact unrefuted evidence was that Steve Maxson flagged that area in July and then he followed the orders of his superior in not digging up that area. Also, the mayor indicated that he was never aware of that leak but there was testimony by Dave Shane that the constituent and also the administrative assistant had made the mayor aware of that in July of 2017. I think it's... But besides trying to puncture what you're characterizing as a pretextual reason for your client's firing, don't you have to give us some basis to conclude that the city council knew about the instance of the reported misconduct for that to be a relevant competing cause of his termination? Well, I do think, Judge, that there was evidence for a fact finder to consider when Steve Maxson testified that he very specifically reported Chris Wilder's activities with regard to the cold patch to Don Schulteis and Don Schulteis did indicate in his deposition and also in the administrative record that he had come forward with those complaints. He did not specifically recall the date when he made the mayor and council aware of that specific complaint but Don Schulteis does say he repeatedly reported to other commissioners and to the city's council that Mr. Maxson was facing harassment, that every time that Don Schulteis made the mayor or other commissioners aware of his perception that Steve Maxson was being harassed, then the mayor drilled down further on Steve Maxson. It's right in Don Schulteis' deposition testimony that when he made the mayor aware of complaints by Steve Maxson, then the mayor doubled down on him. Certainly, Your Honor, the evidence from Steve Maxson, Don Schulteis, the mayor, Dave Shane should be allowed to be considered by a fact finder. In this instance, the court took away the opportunity for Mr. Maxson to have a fact finder weigh that circumstantial evidence and I would assert that there are certainly more than one inference to be drawn from the issues of material fact that we laid out with respect to Steve Maxson's complaints about the cold patch. Also, I think if we look at how the commission and the mayor disciplined other employees in relation to what happened with Steve Maxson, that that also is evidence of pretext. Here we have the mayor admitting Don Schulteis and other commissioners that Dave Shane had committed negligent acts in his paperwork at the water department. In fact, Dave Shane had admitted to lying to the mayor and the commission about attending classes that he was being paid to and instead told his commissioner that the classes had been canceled. So, I think when we evaluate the constellation of the facts that are in dispute, that certainly Steve Maxson should have been allowed to go before a fact finder. In the case, certainly at least the judge was allowed to sit as a fact finder in that case and make a determination whether the assertions made by the plaintiff in that case proved the causal nexus. I think also in the Matros case that was cited by the defendant in their brief, in that instance, it was a very close call. Even in the Michael Precision case where the Supreme Court has recognized that the intent of the employer in these types of situations where we normally do not find a smoking gun of retaliation, the Supreme Court has said that the primary issue for consideration is the intent of the employer and that that ultimate issue is for a determination by the fact finder. Now, if in this case, Shanoa would not have proffered a reason for the termination that it was this leak on December 31, 2017 and essentially because Mr. Maxson was grossly negligent in not taking care of it in July of 2017, then I might not be before your honors asserting that this should have gone to the jury. But in this instance, there is evidence that the proffered reason does not comport with what Shanoa did with other That policy specifically indicates that with regard to suspensions and orders of dismissal, it will be the supervising commissioner who brings that forth to the city council for consideration. Defendant will argue that that consideration of whether or not the city of Shanoa followed its own is not relevant because of the court's determination on count five. But I would assert to you honors that it is relevant with respect to deciding pretext. Cases in the retaliatory discharge arena have often recognized that an employer's failure to follow its own internal decision making or policies about termination or suspension can be evidence of retaliatory discharge. And I do believe that we have that in this instance because the discipline and termination policy that Shanoa adopted specifically says that it should have been up to as a consequence of that December 31st, 2017 issue. And I see your honors that I have about four minutes left and I would like to go ahead and just reserve that time for rebuttal if I could. All right. Thank you, Ms. Wall. You'll have time and Mr. Sokin, you may proceed with your argument. Thank you, Justice. May it please the court and I think we need to take a step back here and look at this from the beginning before we get into these facts on a very basic issue of how can someone be retaliated against if no one knows they've complained. And that is, I think, the major issue that the court needs to take up before we get into all these issues about what is a whistleblower, what was pretext, is what did the people who made the adverse employment decision actually know here? Because if you look at the records, what you will find is that Don Skoltheis never told a single soul any of the allegations that are in Mr. Maxon's complaint on the city council. Let's cut that a little finer. We're at summary judgment, so we've got to indulge every inference in favor of the non-moving party, right? Correct. So, Scholtheis said that if the plaintiff did raise the complaints, he's sure he would have taken them to the mayor. Is it a fair inference from that that he did so? No, because that's not what he said. If you look on page 784 of the common law record, that is Mr. Skoltheis's deposition. And then page 91 of that deposition, he was asked these very questions about what did bring to the mayor. And what he said was, well, if I did, I would have brought it up in a city council meeting and there would have been a transcript of that made. Has anyone in this court seen a transcript of any of these reports being made by Mr. Skoltheis in one of these hearings? No, because it never happened. The employer is the village, right? Correct. The city. Why is not the knowledge of Scholtheis imputed to the village? Because the adverse employment action was taken by the village, which has a council form of government that required a vote. And there was a four to one vote that was made to terminate his employment after this issue. And admittedly, I think Mr. Maxon would have to admit, based on Mr. Skoltheis's testimony, that four of the five people who voted to terminate him had no clue about any of these allegations that he made because he would make these written complaints to Mr. Skoltheis, who then put them in a file cabinet in his basement, never shared them with anyone. And they were apparently destroyed in a flood. And Mr. Skoltheis testified that all he could do was speculate as to whether he brought these up to anyone else. He said he might have. And when pressed on it, he said, well, if I had done so, it would have been done in one of these city council meetings. And it would have been on the audio recordings or the transcriptions. None of which exist. Oh, sorry. Mr. Stokin, in terms of the various reports that the plaintiff brought to Skoltheis, and then Skoltheis said he may have taken some of those reports to executive sessions. Did those reports exclusively deal with complaints relating to Wilder, or did they include other non-Wilder issues, such as just general matters that plaintiff was dealing with in work? So the issue to your question is, there was a meeting between Mr. Maxine, Mr. Skoltheis, and the city attorney, where he did bring up some complaints, but none of them were the ones that are in his actual Second Amendment complaint here that he directed against the mayor. Council said, oh, there were complaints about other employees that, you know, quote unquote, getting away with certain conduct. There were some issues about digging before they called to make sure they weren't going to hit any underground lines. Those complaints were made to the city attorney, but those are not, if you check those against the complaints that are in the Second Amendment complaint, none of them match up. So to answer your question, Justice Harris, I believe there were complaints made to the city attorney, but they are not the ones that are an issue in this litigation. Well, and then mine was more general. The issues that a plaintiff might have taken to Skoltheis, and then Skoltheis may have then passed them along in executive session. Does the record indicate that those were exclusively complaints relating to Wilder, or did those issues pertain to other matters, such as work conditions and so forth? I believe it depends on what you mean by about the mayor, because number one, there's nothing in the record that shows they were ever brought to anyone, as I just discussed about Mr. Skoltheis's deposition testimony. But if you look at the Second Amendment complaints, there's five allegations, I would say two of which are against the mayor, this alleged issue about the asphalt and this kickback. And then there are three that I think are more general about the city cut down a tree, the city let someone borrow a lift, the city replaced a broken water meter. Those three, I think, are just generally against the city, not against anything that the mayor himself did, as if he was doing this of his own outside the scope of his mayoral duties, if that answers your question. It does, thank you. So I think the first question then would be, was Mr. Maxon fired because of these complaints? And as the trial court had to take the testimony as it stood at summary judgment, Mr. Skoltheis's deposition testimony basically foreclosed that from happening. It's sort of the, if a tree falls in the woods, it doesn't make a sound. If he complains to only one person who never brings it up to anyone else, and those other people are the decision makers who decide the adverse employment decision, how can there ever be factual retaliation? Because all that was discussed at this meeting was this December 31 water leak that Mr. Maxon allegedly ignored for six or seven months that became this huge problem. And there was never any testimony anywhere in the record that any of them had any idea about these five allegations that appear in the second amending complaint. So I think that's a primary threshold matter that the trial court couldn't get passed was, Mr. Maxon says he told this one person, this one person didn't tell anyone else. And because we have a five person vote that goes four to one, how could he ever factually prove retaliation to set forth the cause of action? Is there any authority for basically saying that unless you get the knowledge to a majority of the voting board, that it doesn't work? I don't believe, I did not come across a single case with this fact pattern, Your Honor, when I was researching. Thank you. The cases that I came across that I think are most relevant to the situation is this court's decision in Sweeney versus City of Decatur, where the issue there was the city manager was basically commandeering police vehicles to get escorts to the airport to go on vacation. And the police chief told the city manager, that's illegal, you shouldn't be doing that. He also told the deputy chief of police who agreed with him that this was illegal and he shouldn't be doing that. And this court went through, what does it mean to disclose a matter for purposes of common law retaliation or purposes of a whistleblower claim? And this court held, you cannot just keep the information internally to your employer. That's not a disclosure because in order to be a whistleblower, it contemplates that you are revealing this information, that you're making it known. And simply by telling the employer or by telling even just the violator, you're not doing that. You're basically saying what you're doing is a bad act. You're not telling some outside governmental entity or law enforcement agency, something nefarious is happening here that needs to be investigated. So if that's true, would your position be that if he sent a letter to each of the city council members stating all of his allegations against the mayor, that that would have been insufficient? If that had occurred, Justice, I would believe that my argument about he couldn't prove he was terminated because of that, I believe that would be out the window had that happened. But had that happened, I think the issue in Sweeney probably would still preclude that because... Yeah. Because your point is that's still the employer.  Okay. Yeah. I think your point with my argument about he can't prove factual retaliation on the because of prong would be thwarted by your hypothetical. I don't think though it would thwart Sweeney though, because Sweeney's position is you've got to tell someone outside the employer. And I think a hypothetical in response would be if Mr. Maxon had just told another one of his coworkers and they sort of chatted back and forth, oh, can you believe what the mayor is doing? And they were the only two who knew that. And then he later gets terminated. Can he come back and say, oh, I was retaliated against? Because in that scenario, none of the five people would have known about it. And clearly he couldn't meet it there. And I think the point in Sweeney is whistleblowing is a term of art. And we give that protection in only two very specific scenarios, which is when someone files a worker's compensation act claim, or when someone goes outside of the employer to report serious conduct to a law enforcement agency. And the reason we do that is because we want employees protected to know that they can go and report serious conduct that is illegal or a violation of law so that it can be corrected for the safety of the citizens of Illinois. Does the reporting to the employer have the same effect when it's a retaliatory discharge claim and not a whistleblower claim? According to Sweeney, it does not. In Sweeney, this court held that the language of the whistleblower act that says you have to disclose something. And the way that courts have interpreted common law retaliatory discharge is the only two protected activities. One, as I mentioned, was filing a worker's compensation act claim. And the second is whistleblowing itself. So it's sort of a recursive definition that Sweeney said, okay, in order to be a whistleblower, you have to do this. And then under common law retaliation, you have to be a whistleblower. So because the plaintiff and Sweeney didn't go outside of the employer, he didn't make something known or bring something to therefore he wasn't a whistleblower. Therefore he couldn't make a common law retaliatory discharge claim either. There is a competing case out there that is the Brame decision that this court essentially rejected when it decided Sweeney. And in my research in Sweeney, Sweeney has been the more accepted case law over Brame. Most courts that have decided this issue, particularly in the federal courts, have decided that Sweeney is the law of Illinois, not Brame. And that if you make a report only internally to your employer, you're not doing the citizens of Illinois the service of making this known publicly because your employer can just deep six the information, decide to do nothing. Therefore you don't get those protections as a whistleblower. We give those protections to people who step outside the bounds, so to speak, with a real risk to themselves and to their careers to notify outside law enforcement, outside investigative agencies to look into this, to where they're put in some serious danger. Whereas here, the only person that Maxon reported to was Mr. Skoltheis, who admittedly had his back throughout his entire employment there. He was the one person who didn't vote to terminate Mr. Maxon. And the question is, when you read those transcripts, why did Mr. Skoltheis never bring any of this up to the other commissioners? He didn't do it when they held their termination vote. He didn't do it during the appeal. Mr. Maxon didn't bring any of this up during his appeal. There's simply nothing in the record where he ever brought any of this up. And I think under that scenario, the court doesn't really need to get into how far do we take Sweeney. I think the court can just say, well, he'll never be able to meet the because of prong because only one person in, only one of the five people knew about it and the other four didn't. And to Justice Doherty's point, if he had sent that letter, then the case would be entirely different. But simply by telling the one person who has his back, I don't think he can quantify as whistleblowing or to meet his burden of proving that I must have been fired because of this. And counsel says, well, this issue with the December 31 water leak was pretextual. But if you look at the hearings, they had been having issues with Mr. Maxon for many years. This was sort of the straw that broke the camel's back. There were issues with him misreporting his time, writing down more time than he actually worked for which he was punished. There were issues with him failing drug tests, failing to complete his water license, failing to shut off water mains that he had left running. So it wasn't as if they just cooked this matter up at the last second to try to terminate him. This was an ongoing course of conduct for which he'd been punished previously. And they finally said, you know what, what happened on December 31, he could have stopped this leak in the summer. He didn't. Now the city had to spend all this money to bring in these outside contractors. And at that point, they just said, we've had enough. And there was one point that council made that said the mayor was the one who instigated this. If you look at the transcripts, the mayor was not even the one who brought up the vote to terminate him. It was Commissioner Dave Price who brought up the termination motion, and it was Commissioner Buchanan who seconded the motion. So the mayor wasn't even the one who spearheaded this issue of bringing up the motion to terminate. It was two other council members who, again, I know I'm these complaints about the mayor or about the city or anything. So I think if we can get past the because of, which I don't think we can, I think because of has to end the plaintiff's complaints. If we get past that and get into the issue of, well, he only reported it to this one person, Sweeney says that's just not enough. You have to go outside of your employer in order to do that. Council brought up this issue with the municipal code. The problem with the municipal code argument, it was rejected by the trial court. It was not brought up in the appellant's brief, and it's been forfeited. So I don't think it needs a response, but just quickly, the issue there is that the municipal code flat out says, regardless of what your policy documents might say, the city council has a right to terminate the heads of any major departments on a vote, and that these employees are at will regardless of what the policy says. Now, the policy here for the city says he's an at will employee. I don't think anyone's going to dispute that, and I don't think council disputes it. But regardless of what it says, we don't need to take it up to say it's pretextual because the state of Illinois and the municipal code has already said that the city council had a right to terminate him no matter what. So under the facts as they existed at summary judgment, and at the time that this reached the trial court, there were just multiple issues that the trial court judge found that Mr. Maxon was never going to be able to prove his case. There would be no point for this going to a jury because he's not going to survive the issue with proving that he was terminated because of his reporting, because he just didn't report it to the people who made the decisions. And I think that would go back to my hypothetical of two people talking to each other, two lower level employees who say, could you believe what our employer is doing? That cannot suffice as whistleblowing because you're not even bringing it to the violator. Even in this case where Mr. Maxon says the mayor is the violator, he never even brought it to the mayor's attention. He admits he didn't bring anything directly to the mayor's attention. He only brought it to Mr. Skoltes' attention. And under the facts and under the laws this court has set forth in Sweeney, there is no common law retaliation here and there is no whistleblower claim here. Thank you. All right. Thank you, Mr. Sokin. Ms. Wald, rebuttal argument. Thank you, your honors. Very briefly, council indicates that here Mr. Maxon did not report his assertions to the violator. If that were the case, and Mr. Maxon was just talking with the mayor, I would agree that Sweeney and your decision in Sweeney would preclude us moving forward. However, in this instance, Mr. Maxon went direct to his supervisor. And I think council's argument underscores the fact that there are legitimate, genuine issues of material fact that are in dispute. Don Schultes in his deposition indicated that he did make complaints in front of the commission about how Steve Maxson was being treated. In fact, in the common law record from the, I'm sorry, the administrative record, there are multiple instances where Don Schultes in arguing for Steve Maxson says, I've come to you guys previously about the harassment that Steve Maxson is facing. He even testified in his deposition that every time he brought those complaints to the commissioners and the mayor, the mayor doubled down on Steve Maxson. So I do believe that in this instance, the subject matter of what he needs to bring to somebody beyond his immediate supervisor isn't his harassment. It's the mayor's wrongdoing, right? And where does the record help us on that? Well, I think that Don Schultes does say, your honor, that if Steve took those to the mayor, and in fact, I think Don Schultes says at one point in his deposition that he did take complaints to the mayor. He does not state specifically a recollection that he had a conversation with the mayor about the cold patch, but he did testify that he and Steve Maxson went out. He observed that conduct happening and he indicated in his deposition that he believed he talked with the mayor about it. What about counsel's argument that, I mean, there were still three people, Buchanan, Price, and Streich, where there's no evidence they knew, and their three votes would have been enough to terminate him? Well, your honor, I would suggest that Chris Wilder was the party in the room when the council took up the issue of Steve Maxson's termination that moved that entire train forward. It was not those commissioners. In fact, the mayor indicated at the outset of the administrative record, we are here this evening regarding this water incident that happened. He explained that he had no confidence in Steve Maxson, and that he believed it was negligence, and the mayor asked for one of those commissioners to make the motion to terminate. I also looked for cases where the enterprise that makes the decision for termination is greater than one person, and I did not find any retaliatory discharge case where because a board made the decision, or because the corporate board made the decision for retaliatory discharge termination, that that insulated the employer from a claim of retaliatory discharge. What if he had brought it to all five of them? Isn't that still a stumbling block that he's still just bringing it to the employer rather than a whistleblowing to some authority? Well, your honors, I don't read Sweeney as broadly as counsel suggests. I don't believe that your honors decided in the Sweeney case that the whistleblower statute or common law retaliatory discharge claims require a disclosure to somebody other than the employer. I think Sweeney says, okay, in this instance, the police chief only complained to Tim Gleason, the violator, and a subordinate who was the deputy chief. The Sweeney decision does not state that they're overruling or in conflict with the Bram courts indication that when you have a public employer or a government employer, you don't have to reach out to a separate government law enforcement agency. Bram said it was sufficient to make a report to a government enterprise if you were an employer. And so I don't read Sweeney as broadly, your honors. I just appreciate your time and consideration. And I would ask that the decision by the court below be reversed. Okay. Thank you. And I'll ask my colleagues if there are any additional questions. All right. Okay. Thank you, counsel. Thank you both for your arguments. The court will take the matter under advisement and we will issue a written decision. The court stands in recess.